UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROSLYN WOODALL on behalf of J.W[1]., | ) | CASE NO. 5:12CV1818 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[2], | ) | |
| COMMISSIONER OF | ) | **REPORT & RECOMMENDATION** |
| OF SOCIAL SECURITY, | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| Defendant. | ) | |

Roslyn Woodall ("Plaintiff"), acting on behalf of J.W., a minor ("Claimant") and Plaintiff's grandson, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Claimant's Supplemental Security Income ("SSI") claim.  ECF Dkt. #1.  Plaintiff asserts that the ALJ erred in failing to perform a proper analysis of whether Claimant's impairments met or equaled Listing 112.08 for Personality Disorders and lacked substantial evidence for finding that J.W. had less than marked limitations in the "caring for yourself" domain for functional equivalence.  ECF Dkt. #16.  For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMANDS the instant case for a more thorough Step Three meets or equals and functional equivalence analysis:

**I.**    **PROCEDURAL HISTORY**

On May 21, 2009, Plaintiff, acting on behalf of Claimant, protectively filed an application for children's SSI, alleging disability beginning August 1, 2003 due to Attention Deficit

---

[1]*See* L.R. 8.1(a)(2).

[2]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Hyperactivity Disorder ("ADHD") and behavioral problems.  ECF Dkt. #12 at 110, 131, 135.[3]  The application was denied initially and on reconsideration.  *Id*. at 69-77.

Plaintiff filed a request for a hearing by an ALJ and on February 9, 2011, an ALJ conducted an administrative hearing, where Plaintiff and Claimant appeared and were represented by counsel.  ECF Dkt. #12 at 77-82, 36.  At the hearing, the ALJ accepted testimony from Claimant and Plaintiff.  *Id*.  On February 18, 2011, the ALJ issued a Notice of Decision - Unfavorable.  *Id.* at 16-29.  Plaintiff requested review of the ALJ's decision to the Appeals Council, but on May 10, 2012, the Appeals Council denied Plaintiff's request for review.  *Id*. at 1-11.

On July 16, 2012, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  On January 28, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #16.  On April 15, 2013, Defendant filed a brief on the merits.  ECF Dkt. #18.  Plaintiff filed a reply brief on April 29, 2013.  ECF Dkt. #19.

**II**.    **RELEVANT MEDICAL/SCHOOL HISTORY**

Claimant's school records show that he received speech and language therapy through Head Start which ended on December 19, 2002.  ECF Dkt. #12 at 190.  An evaluation team report prepared by  Terry Bendo, school psychologist of the Akron Public Schools Integrated Preschool Program,  indicated that Claimant had been in foster care and his most recent foster mother reported that he had not developed age-appropriate social or behavioral skills and he needed constant supervision for safety reasons.  *Id*.  Claimant's foster mother indicated that he resolved conflicts by hitting, swearing and breaking things.  *Id*.  Claimant was born to a teenage mother who did not bond with him and he never knew his biological father.  *Id*. at 49, 219.

Mr. Bendo further reported that Claimant had been reunified with his mother in 2003 but was now in the legal custody of Summit County Children Services but in the care of his grandmother, a former drug addict who lived in her home with three of Claimant's aunts, two of whom are minors, and four cousins who were all minors.  ECF Dkt. #12 at 64, 190.  Claimant had no contact with his biological father.  *Id*.  Mr. Bendo further reported that Claimant was identified as a preschooler with

---

[3] Page numbers refer to "Page ID" numbers in the electronic filing system.

a social-emotional behavioral disability and placed in a preschool behavior-specific classroom. *Id.* Claimant made progress and his educational environment became less restrictive and he was in a traditional integrated preschool program. *Id.* Mr. Bendo administered testing which showed that Claimant had average nonverbal abilities and low average verbal abilities. *Id.*

A July 23, 2004 parent questionnaire completed by Claimant's grandmother indicated that he would not sit still and was constantly hitting other children. ECF Dkt. #12 at 191. The results of the Behavior Assessment System for Children, Teacher Rating Scales-2 ("BASC-II") administered by his teacher showed concerns with Claimant's externalization or acting-out behaviors. *Id.* at 211. Claimant's teacher reported that in the classroom, he was excessively active and prone to verbal and physical aggression, often bullying others and talking back to teachers. *Id.* Other behaviors observed in the classroom included Claimant picking at things, such as his hair, nails or clothing, babbling, staring blankly, and trouble adjusting to new teachers. *Id.* He also threw tantrums, threatened to hurt others, and used foul language. *Id.*

It was noted that a parent version of the BASC-II was sent home with Claimant multiple times, but never returned. ECF Dkt. #12 at 211. Eventually, Claimant's teacher read the results of the BASC-II for Claimant to his grandmother at a meeting, and the team warned in the report to interpret the grandmother's behavioral profile for Claimant cautiously because she tended to be excessively negative and internally inconsistent in describing Claimant's home behavior. *Id.*

Staff notes of Claimant's behavior in the classroom indicated that he had very poor attendance initially and his family had moved twice in one month. ECF Dkt. #12 at 212. It was reported that Claimant was quite bright as he had learned the concept of opposites after only one exposure. *Id.* Claimant's typical classroom behavior was described as requiring frequent, but not unusually excessive, adult redirection. *Id.* Mr. Bendo opined that Claimant would benefit from increased exposure to behavior-typical peers. *Id.*

Claimant's gross motor skills were evaluated as his strength and his fine motor skills were adequate. ECF Dkt. #12 at 214. It was reported that he had a difficult time staying with tasks or skills that he was not interested in or those that presented a challenge. *Id.* at 217. He needed firm

guidance and directives in following classroom rules and needed adult support in group, and he talked loud and used inappropriate language. *Id.*

It was opined that Claimant's behavioral conditions were the result of social maladjustment. ECF Dkt. #12 at 219. Bases for this determination indicated that Claimant was born to a single teenage mother, had no contact with his father, and had been in the custody of Summit County Children Services Board and in numerous foster homes. *Id.* Further, Claimant was living with his grandmother and seven other aunts and cousins who ranged in age from 3 to 27. *Id.* It was surmised that Claimant's behavior was more likely the result of a difficult adjustment to his "tumultuous life circumstances" rather than a long-standing and deep-seated emotional disturbance. *Id.* On September 7, 2004, Claimant's grandmother and teacher signed the evaluation report, as well as Mr. Bendo and a coordinator. *Id.* at 220.

A printout of Claimant's discipline report from school shows that he was suspended numerous times and disciplined over 50 times for fighting, insubordination, improper language, and violating school rules from 2006-2009. ECF Dkt. #12 at 242-254. One of the incidents involved Claimant forcing himself on another child and urinating in his mouth. *Id.* at 253. Claimant also punched other children, urinated in the direction of other students, made racial slurs and spat at other students. *Id.* at 254.

On September 9, 2009, a follow-up evaluation team report from the Akron Public Schools was prepared. ECF Dkt. #12 at 262. School Psychologist Rasheed Bonner indicated that Claimant was now ten years old and was last assessed for behavioral concerns in 2004 and did not qualify for special education. *Id.* at 264. Teachers' behavioral observations indicated that Claimant exhibited behaviors such as verbally and physically assaulting other students, crawling and flopping down on the floor, spitting, leaving the class without permission, roaming the class and hallways, refusing to complete classwork, yelling and talking out in class, and throwing books and other materials. *Id.*

Ms. Bonner also administered the Woodcock-Johnson III Tests of Cognitive Abilities which showed that Claimant's intellectual functioning was in the average range, with adequate skills in verbal ability, thinking ability and cognitive efficiency, which ruled out the possibility of a cognitive disability or mental retardation. ECF Dkt. #12 at 267. Ms. Collier, Claimant's teacher, administered

the Conners-3 Teacher Rating system in which she assessed information regarding Claimant's behavior compared to children of the same age. *Id.* at 272.  She also administered the BASC-II for children and found that Claimant measured clinically significant elevations on the scales of hyperactivity, aggression, conduct problems, atypicality, adaptability, externalizing problems and behavioral symptoms index. *Id.* at 274.  Claimant also measured as at-risk elevations for depression, somatization, attention problems, learning problems, and social skills. *Id.*  Ms. Bonner also administered the House-Tree-Person Projective Test, and Claimant's drawings showed that he had paranoid tendencies, anxiety, emotional immaturity, impulsivity, environmental constriction, little satisfaction in environment, frustration, inadequacy, assertiveness, reluctance to show feelings, and physical aggression. *Id.* at 276.  Based upon the entire evaluation, Claimant qualified for special education and services in the category of emotional disturbance. *Id.* at 284.

The school psychologist indicated that Claimant may benefit from intense behavioral interventions to support his academic progress in school.  ECF Dkt. #12 at 265.

In the second grading period of Claimant's fourth grade report card, his teacher commented that he was making progress in controlling his inappropriate behavior and it was recommended that he read more at home to improve his fluency and comprehension skills.  ECF Dkt. #12 at 339.  The teacher's comments for the third grading period of his fourth grade report card indicating that Claimant was making "tremendous" progress in controlling his behavior and it was recommended that he read more at home. *Id.*  The comments for the fourth grading period indicated that Claimant needed to read more at home, he was doing very well in math, and he needed to control his inappropriate behaviors when he was not supervised by adults. *Id.*

A psychological examination conducted on September 9, 2009 by Dr. Leidal at the request of the agency indicated that Claimant was ten years old and his grandmother reported that he was getting kicked out of school every other day because of his bad behavior.  ECF Dkt. #12 at 234.  She further indicated that she had gotten three calls to take Claimant home from school since the fall because of oppositional and disruptive behaviors and "was told that she could get a check for this." *Id.*  Plaintiff reported that Claimant has had behavioral problems since he was four years old and he seemed to be depressed because neither his mother nor his father have been there for him. *Id.*  She

indicated that she had been told for some time to get Claimant psychiatric help or counseling, but she had not done so, although she stated that she planned to "in a minute." *Id*. at 235.

Upon examination, Dr. Leidal found that Claimant was alert and clearly well oriented. ECF Dkt. #12 at 236. He noted that Claimant was only marginally cooperative because he refused to sit up or respond to his grandmother or Dr. Leidal without considerable prompting or cajoling and he tended to suck his thumb for most of the evaluation. *Id*. Dr. Leidal found that Claimant's responsiveness to environmental stimuli was normal for his age and his attention and concentration was fair for his age. *Id*. Claimant's pace in responding was adequate and while his fund of information was below average, his general intelligence appeared average. *Id*. His speech and language were normal for his age, but his mood during the examination was irritable and congruent. *Id*. Dr. Leidal found Claimant's anxiety to be within normal limits and his ability to perform activities of daily living. *Id*.

Dr. Leidal concluded that Claimant's most serious mental symptoms were oppositionally defiant behaviors, fighting, and irritable moods. ECF Dkt. #12 at 237. He scored his global assessment of functioning at no greater than 40. *Id*. Dr. Leidal found that Claimant's most serious functional problems were moderate to marked in social and academic functioning in judgment, which resulted in a GAF score of no more than 55. *Id*.

Dr. Leidal diagnosed Claimant with Oppositional Defiance Disorder ("ODD") and adjustment disorder with mixed disturbance of emotions and conduct. ECF Dkt. #12 at 237. He opined that Claimant had:  low average intellectual functioning that was moderately impaired; memory functioning at 3/4ths of age expectation; normal communication and language skills; normal fine and gross motor skills; unimpaired attention and concentration; mild to moderately impaired pace and persistence; social development and relating to others was approximately 2/3rds of age expectations; adaptive skills were below average for age expectations; and Claimant's personal behavioral patterns, such as self-control and response to limit setting, were moderately to markedly impaired and approximately 2/3rds to ½ of age expectations. *Id*.

Dr. Goldsmith, an agency reviewing psychologist, had reviewed Claimant's records on September 17, 2009 upon Plaintiff's initial application and found that his ODD and adjustment

disorder with mixed disturbance of emotions and conduct were severe, but did not meet or medically equal any of the Listings.  ECF Dkt. #12 at 255.  Dr. Goldsmith further found in determining functional equivalence that Claimant had less than marked limitations in acquiring and using information, interacting and relating with others, caring for self, and in health and physical well-being, and he had no limitations in attending and completing tasks or in moving about and manipulating objects.  ECF Dkt. #12 at 256-258.  In finding Claimant less than markedly limited in interacting and relating to others, Dr. Goldsmith cited to Dr. Leidal's finding that Claimant was functioning at 2/3rds age expectation in this domain.  *Id.* at 257.  He also cited evidence of Claimant's ODD, the cajoling and prompting it took to get Claimant to participate in the interview with Dr. Leidal, his refusal to sit up and response to his grandmother and Dr. Leidal, reported poor interactions between Claimant and others, his few friends and his behavioral problems at school. *Id.*  As support for his less than marked opinion as to Claimant's domain of caring for self, Dr. Goldsmith relied upon Dr. Leidal's note of below average adaptive skills and Claimant's oppositional and disruptive behaviors at school.  *Id*. at 258.

On February 9, 2010, Dr. Taggart, Claimant's family practice physician, completed an agency questionnaire indicating that he had first seen Claimant on August 21, 2008 and last saw him on October 2, 2009.  ECF Dkt. #12 at 223.  He diagnosed Claimant with behavioral problems not elsewhere classified ("NEC") and reported that starting in the fourth grade, Claimant was getting into daily trouble for "'fighting and acting bad in class.'" *Id.*  He thereafter referred Claimant to child psychiatry for evaluation and treatment.  *Id.*  Dr. Taggart's medical notes indicated that Claimant met with Dr. Taggart's nurse practitioner and Claimant's grandmother told the nurse of Claimant's behavioral problems at school.  *Id.* at 228-229.

Dr. Hoyle, an agency reviewing psychologist, reviewed Plaintiff's records on March 16, 2010 upon reconsideration of the denial of Plaintiff's application for SSI for Claimant and identified Claimant's impairments as ODD, adjustment disorder with mixed disturbance of emotions and conduct, and behavioral problems NEC.  ECF Dkt. #12 at 286.  She found that Claimant's impairments did not meet or medically equal any of the Listings.  *Id*.  As to functional equivalence, Dr. Hoyle opined that Claimant had less than marked limitations in acquiring and using information,

attending and completing tasks, and caring for self, but he had a marked limitation in interacting and relating with others. *Id*. at 288. She further opined that Claimant had no limitation in the domain of health and physical well-being. *Id*. at 289. As support for her opinion that Claimant had a marked limitation in interacting and relating with others, Dr. Hoyle relied upon Dr. Leidal's consultative report and the May 9, 2009 Evaluation Team Report at Claimant's school which showed that Claimant's teacher had administered the Behavior Assessment System for Children, Teacher Rating Scales-2 ("BASC-II") and found that Claimant measured clinically significant elevations for hyperactivity, aggression, conduct problems, atypicality, adaptability, and externalizing problems. *Id*. at 274. In explaining her finding of "less than marked" limitations for Claimant in the domain of caring for self, Dr. Hoyle cited to Claimant's oppositional and disruptive behavior at school and Dr. Leidal's notes stating that Claimant's adaptive skills were below average for age expectations. *Id*. at 258. She also cited Plaintiff's report that Claimant threw sticks and threw tantrums. *Id*. at 289.     Claimant was also assessed on June 23, 2010 by Child Guidance and Family Solutions. ECF Dkt. #12 at 293. The therapist, Ms. Williams, noted that when she came out to get Claimant for his assessment, he had run down the street and his family had to go and get him to come back. *Id*. at 295. He then laid under the chairs in the lobby with his thumb in his mouth and his socks and shoes thrown against the wall. *Id*. He then went into her office and sat on the floor in the corner with his thumb in his mouth looking angry. *Id*. He kept saying that he had no mom, no dad, no grandma and no family. *Id*. After a few minutes of talking, Claimant moved to a seat, took his thumb out of his mouth, and was smiling and acting appropriately. *Id*. By the time he left, Claimant was laughing, compliant and appeared happy. *Id*.

Claimant was uncooperative with the interview, and was impulsive, oppositional, fidgeting and agitated. ECF Dkt. #12 at 294. It was related that Claimant's mother lived near Claimant but did not want to spend time with him, although she did come to get his brother and spend time with him. *Id*. at 295. Claimant's father was in prison and Claimant had never met him. *Id*. Claimant indicated that his grandmother does not follow through with what she tells him she will do and it made him angry. *Id*. Plaintiff reported that she used to be a drug addict until three years ago and Claimant's mother was only 13 when she had Claimant. *Id*. Claimant reported that he sometimes

-8-

hits his grandmother and brother, wets the bed sometimes, was often depressed, and thought about suicide but never attempted it and had no plan.  *Id*. at 297.

Ms. Williams reported that Claimant was in the fifth grade at Legget Elementary School in a special education placement, and his general behaviors were that he became easily upset and frustrated, he defied authority and he acted inappropriately.  ECF Dkt. #12 at 296.  His academic functioning was restless and distracted and he had poor grades, behavioral problems and difficulty focusing, although he was good at math.  *Id.*  Ms. Williams diagnosed Claimant with depressive disorder not otherwise specified, relational problem not otherwise specified, and ODD.  *Id*. at 298.

On September 10, 2010, Claimant underwent a diagnostic assessment for inappropriate behavior in the classroom.  ECF Dkt. #12 at 306.  It was noted that Claimant was defiant, oppositional, crawled on the floor and hid under desks and sucked his thumb.  *Id*.  Claimant was diagnosed with ODD and it was concluded that he would benefit from school-based mental health services and community psychiatric support services to improve his anger management skills, his coping skills, build his self-esteem, and to help him identify and express his feelings appropriately and safely.  *Id*. at 319-320.

School records from Claimant's fifth grade individual education program beginning October 28, 2010 indicated that Claimant liked math and received math instruction in a regular fifth grade class.  ECF Dkt. #12 at 326.  The records indicated that district testing in the fall of 2009 showed that Claimant scored in the basic range of reading, and language arts, and above average in math.  *Id.* As to his behavior, it was noted that Claimant needed to decrease his inappropriate behavior and responses to the actions of others, learn to ignore and refrain from teasing and taunting his peers, and learn to control his anger and comply with the requests of authority figures.  *Id*.  Claimant was determined able to participate in state and district wide testing, but needed accommodations in all areas by the use of frequent breaks, small groups and extended time, *Id*. at 333.

## III.    STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last

for a continuous period of not less than twelve months. 20 C.F.R. § 416.906.  An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI.  20 C.F.R. § 416.924(a).  The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing");

20 C.F.R. § 416.924(a)-(d).  In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d)(emphasis added).  In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment.  20 C.F.R. § 416.926(a) (emphasis added).  In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a)(emphasis added).  The Commissioner assesses all relevant factors, including:

> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and
>
> (3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)- (3).  Further, in considering whether a child's impairment functionally equals the Listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments.  20 C.F.R. § 416.926a(b).

The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;

-10-

(iii) interacting and relating with others;

(iv) moving about and manipulating objects;

(v) caring for yourself; and,

(vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e). "Marked" limitation means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.  See § 416.926a(e)(2)(i).  "Extreme" limitation is the rating for the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean.  See 20 C.F.R § 416.926a(e) (3)(I).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled.  20 C.F.R.  § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

**V.      RELEVANT PORTIONS OF THE ALJ'S DECISION**

In the instant case, the ALJ found that Claimant was a school-age child at the time of the filing of the application, was not engaged in substantial gainful activity, and he had the severe impairments of oppositional defiance disorder ("ODD") and adjustment disorder with mixed disturbances of emotions and conduct and behavioral problems NEC. ECF Dkt. #12 at 19. The ALJ further found that Claimant's severe impairments, individually or in combination with other impairments, did not meet or medically equal any of those in the Listings. *Id.* The ALJ stated that he had considered all of the Listings in reaching his determination, with specific emphasis on the Listings in 112.00. *Id.* He then determined that Claimant's impairments, individually or in combination, did not meet, medically equal or functionally equal the Listings. *Id.* at 19-28. Based upon his findings, the ALJ concluded that Claimant was not disabled and therefore not entitled to childhood SSI. *Id.* at 28-29.

**VI.     ANALYSIS**

Both of Plaintiff's assertions of error concern the ALJ's Step Three findings. Plaintiff first asserts that substantial evidence does not support the ALJ's finding that Claimant's impairments did not meet or equal a Listing, particularly Listing 112.08 for Personality Disorders, because the ALJ did not adequately articulate his reasoning for this finding. ECF Dkt. #16 at 8-13. Plaintiff argues in her second assertion of error that the ALJ lacked substantial evidence with which to find that

Claimant's impairments did not functionally equal a Listing because he erred in finding that Plaintiff had less than marked limitations in the "caring for yourself" domain. *Id*. at 13.

The burden of proof at Step Three of the sequential entitlement to children's social security benefits rests with Plaintiff. *Franklin ex rel. L.F. v. Comm'r of Soc. Sec.*, No. 4:10CV2215, 2012 WL 727799, at *1 (N.D. Ohio Feb. 16, 2012), citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The ALJ must "nevertheless provide articulation of step three findings that will permit meaningful review of those findings." *Franklin*, citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011). "As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Hernandez ex rel. L.A. v. Astrue*, No. 1:10CV1295, 2011 WL 4899960, at *6, citing *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm'r of Soc.* Sec., 378 F.3d 541, 544-546 (6th Cir. 2004).

Plaintiff cites to 20 C.F.R. § 416.924(d) and *Reynolds v. Commissioner of Social Security,* 424 Fed. App'x 411, 416, 2011 WL 1228165, at **3-4 (6th Cir. Apr. 1, 2011), unpublished, in asserting that the ALJ must provide clear reasons and support for his Step Three meets or equals analysis so that subsequent reviewers, such as this Court, can meaningfully review and determine whether substantial evidence supports the ALJ's determination.  ECF Dkt. #16 at 9-10.  Defendant contends that because the ALJ found that Plaintiff had only one marked limitation, that of interacting and relating to others, he could not have otherwise met the severity required of Listing 112.08.  ECF Dkt. #18 at 11.  Defendant points out that "[b]oth of the state agency psychologists who reviewed the record found that Plaintiff did not meet or functionally equal a Listing."  ECF Dkt. #18  at 11, citing ECF Dkt. #12 at 255-60, 286-291.

In the Step Three section of his decision, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the Listings.  ECF Dkt. #12 at 19.  He thereafter stated that "[a]ll of the listings were considered in reaching this finding, with specific emphasis on the childhood listings in section 112.00." *Id*.  The ALJ then proceeded to provide analysis and determine that Claimant's impairments did not functionally equal the Listings. *Id*. at 19-28.

-13-

The undersigned recommends that the Court find that the ALJ's Step Three meets or equals analysis is lacking.  While the ALJ stated that he considered all of the Listings, particularly those in section 112.00, the ALJ failed to discuss those Listings and failed to compare them with the evidence of record to show how he determined that Claimant's impairments did not meet or medically equal any of the Listings.  He also indicated that he considered the opinions of the state agency medical consultants, but he did not discuss their findings or opinions in the context of the meets or equals analysis.

In *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411 (6th Cir. 2011), the Sixth Circuit Court of Appeals reversed and remanded the case when the ALJ found that the claimant had severe physical and mental impairments at Step Two of the sequential analysis but failed to analyze the claimant's back impairment at Step Three despite concluding that his back impairment had failed to meet or equal a Listing.  The Sixth Circuit noted that while the ALJ had thoroughly addressed the claimant's severe mental impairments in his Step Three analysis, " '[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe 'back pain' impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not."  *Id.* at 415.  The Sixth Circuit found that:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416 [citations omitted].

Courts within this District have applied *Reynolds* and vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful Step Three analysis that compares the medical evidence to the applicable listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing.  *See e.g., Saleh v. Comm'r of Soc. Sec.,* 2013 WL 3421835, at *8 (N.D. Ohio July 8, 2013); *Waller v. Astrue,* 2012 WL 6771844 at * 2–5 (N.D.Ohio Dec.7, 2012) *adopted,* 2013 WL 57046 (N.D.Ohio Jan.3, 2013); *May v. Astrue,* 2011 WL 3490186 at * 7–10 (N.D.Ohio June 1, 2011) *adopted,* 2011 WL 3490229 (N.D.Ohio Aug.10, 2011); *Keyes v. Astrue,* 2012 WL 832576 at * 5–6 (N.D.Ohio March 12, 2012); *Hunter v.*

-14-

*Astrue*, 2011 WL 6440762 at * 3–4 (N.D.Ohio Dec.20, 2011); *Marok v. Astrue,* 2010 WL 2294056 at * 5 (N.D.Ohio June 3, 2010); *Hakkarainen v. Astrue*, 2012 WL 398595 at * 10–13 (N.D.Ohio Jan.19, 2012) *adopted* 2012 WL 396970 (N.D.Ohio Feb.7, 2012); *Shea v. Astrue,* 2012 WL 967088 at * 8–11 (N.D.Ohio Feb.13, 2012) *adopted* 2012 WL 967072 (N.D.Ohio March 21, 2012). While no heightened articulation at Step Three is required, an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings. *Hunter v. Comm'r of Soc. Sec*., No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011).

Defendant contends that the ALJ's functional equivalence analysis provides the basis for upholding his Step Three finding that Claimant's impairments did not meet or medically equal the Listings. ECF Dkt. #18 at 11. The undersigned notes that the ALJ did discuss the agency medical consultants' opinions in his functional equivalence section, indicating that he had given the opinions of Dr. Leidal, the agency examining psychologist, some weight. ECF Dkt. #12 at 23. He further stated that he gave the opinions of Dr. Goldsmith, the non-examining reviewing psychologist, some weight, and he had attributed great weight to the opinions of Dr. Hoyle, the agency reviewing psychologist. *Id*. In giving great weight to the opinions of Dr. Hoyle, the ALJ found that her assessment was well-supported and consistent with the record as a whole. *Id.*

However, a number of cases in this Circuit hold that an ALJ's functional equivalence analysis does not suffice to substitute for the Step Three meets or equals analysis. *See M.G. v. Comm'r of Soc. Sec.,* 861 F.Supp.2d 846, 859, n.6 (E.D. Mich. 2012)(collecting cases); *Evans ex rel. DCB v. Comm'r of Soc. Sec*., No. 11-cv-11862, 2012 WL 3112415, at *9 (E.D. Mich., Mar. 21, 2012), unpublished (collecting cases). According, the undersigned recommends that the Court find that the ALJ's functional equivalence analysis in this case does not provide an adequate substitute for his lacking Step Three meets or equals analysis.

In addition, and although Defendant does not raise the issue, an ALJ's failure to explain how he reached his Step Three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner. *See Hufstetler v. Comm'r of Soc. Sec*., No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011). In

*Hufstetler*, the Court found that the ALJ's lack of sufficient analysis at Step Three was harmless error because the ALJ's Step Four findings provided sufficient information for the Court to determine that no reasonable administrative fact finder would have resolved the matter differently.  2011 WL 2461339, at *10.

In this case, the undersigned recommends that the Court find that the ALJ's failure to conduct an appropriate Step Three meets or medically equals analysis is not harmless error.  Plaintiff contends that Claimant's impairments meet or medically equal Listing 112.08.  That Listing states the following:

> Personality Disorders.  Manifested by pervasive, inflexible, and maladaptive personality traits, which are typical of the child's long-term functioning and not limited to discrete episodes of illness.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Deeply ingrained, maladaptive patterns of behavior, associated with one of the following:
>
>> 1. Seclusiveness or autistic thinking; or
>>
>> 2. Pathologically inappropriate suspiciousness or hostility; or
>>
>> 3. Oddities of thought, perception, speech, and behavior; or
>>
>> 4. Persistent disturbances of mood or affect; or
>>
>> 5. Pathological dependence, passivity, or aggressiveness; or
>>
>> 6. Intense and unstable interpersonal relationships and impulsive and exploitative behavior; or
>>
>> 7. Pathological perfectionism and inflexibility;
>
> AND
>
> B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two fo the appropriate age-group criteria in paragraph B2 of 112.02.

Listing 112.08. Since Claimant was a child at the time of the alleged date of disability and the date of the filing of the application, paragraph B2 of Listing 112.02 applies to his case.  That paragraph provides in relevant part that:

-16-

112.02 Organic Mental Disorders

B.     Select the appropriate age group to evaluate the severity of the impairment:

2.     For children (age 3 to attainment of age 18), resulting in at least two of the following:

     a.     Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

     b.     Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

     c.     Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

     d.     Marked difficulties in maintaining concentration, persistence, or pace.

Listing 112.02B2.

In defending the ALJ's sparse meets or equals analysis, Defendant points out that he relied upon the opinions of the state agency psychologists and attributed greatest weight to the opinions of Dr. Hoyle.  However, an ALJ is not bound by the opinions of the agency psychologists. Moreover, the opinions of Dr. Hoyle present additional remand issues not only for purposes of the Step Three meets or equals analysis but also for the ALJ's functional equivalence analysis.

In order to meet or medically equal Listing 112.08(B), the relevant section of Listing 112.02(B)(2) must be considered.  The claimant must have marked limitations in resulting in at least two of the appropriate age-group criteria in paragraph B2 of Listing 112.02, which are categories very similar to the six domains in functional equivalence.  Plaintiff asserts that Claimant also has

a marked impairment in the domain of caring for yourself, a domain very similar to Listing 112.02(B)(2) (c) for age-appropriate personal functioning.

Defendant concedes that the ALJ found that Claimant was markedly limited in the domain of interacting and relating with others, which is similar to the social functioning criteria under Listing 112.02(B)(2) when he agreed with Dr. Hoyle, the state agency reviewing psychologist, that Claimant was markedly limited in the domain of interacting and relating with others for functional equivalence purposes. ECF Dkt. # 18 at 11.   However, Defendant contends that Claimant was not markedly impaired in his ability to care for himself.  *Id*. at 13.

The domain of caring for yourself states the following:

(1) General.

(i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.

(ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

20 C.F.R. § 416.926a(k)(1).  The relevant age group for determining the extent of this domain is the following:

(2) Age group descriptors--

-18-

* * *

(iv) School-age children (age 6 to attainment of age 12). You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2).  The regulation provides the following examples of this domain:

(3) Examples of limited functioning in caring for yourself. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i) You continue to place non-nutritive or inedible objects in your mouth.

(ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).

(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.

(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.

(v) You do not spontaneously pursue enjoyable activities or interests.

(vi) You have disturbance in eating or sleeping patterns.

20 C.F.R. § 416.926a(k)(3).

In the instant case, the ALJ did not provide sufficient analysis of the domain of caring for self. ECF Dkt. #12 at 28. He merely repeated that which Plaintiff reported and then discussed the more basic concepts of this domain, such as hygiene and obeying safety rules. *Id.* He did not delve into the other areas of this domain which are relevant to the instant case, including Claimant's ability to control himself and cope with stress and changes in the environment, his engaging in self-soothing activities such as thumb sucking and Claimant's ability to meet his physical and emotional

-19-

needs.  *See* SSR 09-7p ("Caring for yourself" domain includes how well children get their emotional and physical wants and needs met in appropriate ways, how they cope with stress and changes, and how well they take care of their own health, possessions and living area.); *see also Shannon ex rel. K.J.S. v. Astrue*, No., 2013 WL 149819 (N.D. Ohio Jan. 14, 2013), unpublished (ALJ committed error by   not addressing claimant's anger, aggression and ability to control his emotions and respond to stress in the domain of caring for self, although case not remanded because substantial evidence supported ALJ's findings that claimant was less than marked in all other domains).

The ALJ did give great weight to the opinions of Dr. Hoyle, who identified Claimant's impairments as ODD, adjustment disorder with mixed disturbance of emotions and conduct, and behavioral problems NEC.  ECF Dkt. #12 at 286.  She found that Claimant's impairments did not meet or medically equal any of the Listings and as to functional equivalence, she opined that, among other less than marked limitations, Claimant had less than marked limitations in caring for himself, but he had a marked limitation in interacting and relating with others.  *Id*. at 288.  In explaining her finding of "less than marked" limitations for Claimant in the domain of caring for self, Dr. Hoyle cited to Claimant's oppositional and disruptive behavior at school and Dr. Leidal's notes stating that Claimant's adaptive skills were below average for age expectations.  *Id*. at 258.  She also cited Plaintiff's report that Claimant throws sticks and throws tantrums.  *Id*. at 289.

Dr. Hoyle's reasons for finding that Claimant had "less than marked limitations" in the domain of caring for self appear to contradict her finding.  In finding that Claimant had "less than marked" limitations in caring for self, Dr. Hoyle cited to Claimant's oppositional and disruptive behavior at school and Dr. Leidal's notes stating that Claimant's adaptive skills were below average for age expectations.  *Id*. at 258.  She also cited Plaintiff's report that Claimant threw sticks and threw tantrums.  *Id*. at 289. Dr. Leidal indicated in his opinion that Claimant's "[p]ersonal behavior patterns, such as self-control and response to limit setting, have been moderately to markedly impaired and approximately 2/3rds to ½ age expectations."  ECF Dkt. #12 at 240.  He further found that Claimant's "[a]daptive skills are below average for age expectations."  *Id*.  Consistent self-control  is a factor to consider in caring for self, as are adaptive skills.  Thus, Dr. Hoyle's reasons

and her reliance upon Dr. Leidal in finding that Claimant had less than marked limitations in caring for himself are in conflict.

Accordingly, the undersigned recommends that the Court find that the ALJ's inadequate functional equivalence analysis in the domain of caring for self constitutes error that requires remand of not only the functional equivalence finding but also the meets or equals analysis since the caring for self domain of the latter analysis involves similar considerations to the personal functioning section of the former.

## VII.    CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for further analysis and articulation of the ALJ's Step Three meets or equals analysis and the functional equivalence analysis.


DATE: August 12, 2013                          ___*/s/George J. Limbert*_____
                                               GEORGE J. LIMBERT
                                               UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).